FIRST NATIONAL BANK OF KANSAS CITY v. GUARDIAN TRUST COMPANY, Appellant.

In Banc, March 16, 1905.

1. **NEGOTIABLE NOTE: Indorser or Comaker.** A defendant who places his name on the back of a negotiable note payable to plaintiff, made by a third party, in the absence of testimony indicating an understanding or stipulation that he should be held simply as an indorser, is to be considered prima facie a co-maker, and not an accommodation indorser.

2. ———: ———: **Stipulation: Shown by Petition: By Protest.** The fact that, in a suit against a defendant who placed his name on the back of a negotiable note made by another, the petition in one count alleges that such defendant was an endorser and bases the payee's right to recover on that charge, or the fact that the note was duly protested prior to the institution of the suit, will not supply the necessity for proof of a stipulation or an understanding that the defendant was to be held simply as an indorser, and will not alone overcome the rule that where one places his name on the back of a note he is prima facie a co-maker, in the absence of testimony indicating a stipulation or understanding that he was to be held as an accommodation indorser. Such allegation and protest might furnish corroboration to testimony indicating such an understanding, but they alone are not sufficient.

3. ———: T,rust Company: Stockholder: Presumption. Where defendant trust company, sued as a comaker with a railroad company on a note executed by the latter, is shown by the evidence to have at one time been a stockholder in the railroad company, the presumption is, if nothing to the contrary is shown, that at the time it wrote its name on the back of the note, it was still a stockholder.

4. ———: ———: Comaker: Ultra Vires. The statute did not authorize a trust company to become an accommodation maker or indorser of promissory notes, but did authorize it to act as agent in the management and control of the property of the railroad company which executed the note sued on and used the money derived therefrom, the trust company placing its name on the back thereof, with no stipulation or understanding that it was to be held as a mere accommodation indorser. The evidence shows that the trust company did not place its name on the back of the railroad company's note as a matter of accommodation but that it was induced to do so by reason of its interest in the railroad company, not only as a stockholder, but as a creditor, it having largely financed it, and sold its stock and loaned it money, and these facts were known by the bank. It was further shown that the money loaned to the railroad company on the note upon which the trust company is sued was used to pay pressing indebtedness, and that that payment was not only to the interest of the trust company as a stockholder, but increased its chances of finally realizing upon the debts due it from the railroad company. *Held*, that, under the circumstances, the defense of *ultra vires* will not avail.

5. ULTRA VIRES: When Not Available to Corporation. The defense of *ultra vires* should not as a general rule prevail, whether interposed for or against a corporation, when it would not advance justice, but on the contrary would accomplish a legal wrong. The defense of *ultra vires* is never sustained out of regard for a defendant, but only where an imperative rule of public policy requires it.

6. ———: ———: Estoppel. A contract merely in excess of the power granted to a private business corporation, but which is not expressly forbidden either by its charter or the general statutory law, is binding on the company on the principle of estoppel so that it can not be avoided by the corporation as *ultra vires* without a return of the consideration received, if it has been fully performed by the other party and its consideration received by the corporation.

7. ———: ———: ———: Inequity. Where a trust company had adopted a business policy in respect to financing a railroad

company in order that it might be successfully operated, and in pursuance of that policy aided it to borrow money from a bank by placing its name on the back of the note given by the railroad company for the loan, it would be grossly inequitable to permit it to escape the payment of the note on the plea that it had exceeded its corporate powers in executing the note.

Appeal from Jackson Circuit Court.—*Hon. J. H. Slover,* Judge.

AFFIRMED.

*Trimble & Braley, Milford W. Rider* and *H. S. Mecartney* for appellant.

(1) When one's name appears on the back of a promissory note of which he is neither payee nor indorsee the presumption, in the absence of extrinsic evidence, is that he is a maker, but this presumption may be rebutted by evidence showing just what the relation of the parties was. It is always open to him to show that he was not a maker, but that his contract was that either of accommodation indorser, surety or guarantor. Mammon v. Hartman, 51 Mo. 168; Seymour v. Farrell, 51 Mo. 95; Falkner v. Falkner, 73 Mo. 327; Lewis v. Harvey, 18 Mo. 74; Western Boatmen's Ben. Assn. v. Wolff, 45 Mo. 104; Kuntz v. Tempel, 48 Mo. 71; Kingman v. Connell, 150 Mo. 282. (2) The evidence in this case clearly proved that the defendant was not a maker of the note sued on, but was a mere accommodation indorser, and there was no evidence to the contrary. It follows that the finding and judgment of the trial court against the defendant on the first count of the petition as maker of the note was without evidence to sustain it and should be reversed. Seymour v. Farrell, 51 Mo. 95; Mammon v. Hartman, 51 Mo. 168; Lewis v. Harvey, 18 Mo. 74; Crow v. Peters, 63 Mo. 429; Perry v. Barrett, 18 Mo. 140. (3) It is not now open to the respondent to assert that the appellant should have been held as accommodation indorser on the second count of the

petition. The trial court found against the respondent on that count and rendered judgment thereon for the appellant. That finding and judgment has not been appealed from, but is final, and the issues joined on the second count stand finally adjudicated. Downing v. Railroad, 70 Mo. App. 675; Marquis v. Clark, 64 Mo. 601; Hoyle v. Forquharson, 80 Mo. 377; Perry v. Barrett, 18 Mo. 140; Mooney v. Kennett, 19 Mo. 554; Stanley v. Railroad, 100 Mo. 435; State v. Pitts, 156 Mo. 247; Sarazin v. Railroad, 153 Mo. 475; Cox v. Bright, 65 Mo. App. 417. (4) This is not a case where a party to a note is seeking to escape liability simply because it was wrongfully held liable on one count of the petition when it should have been held liable on the other. It was not liable on either. It was not liable on the first count as maker because it was not a maker. It was not liable on the second count as accommodation indorser because it had no power to become such indorser, and its attempt to do so was *ultra vires* and void, conferring no rights or liabilities on anyone. R. S. 1889, sec. 2839; Daniels on Negotiable Instruments (4 Ed.), sec. 386; Field on Corporations, 306; Green's Brice's Ultra Vires (2 Ed.), 252; Thompson's Commentaries on the Law of Corporations (1 Ed.), sec. 5739; 2 Cook on Corporations (4 Ed.), sec. 774; 1 Morawetz on Corporations (2 Ed.), sec. 423; Bank v. Security Co., 22 N. E. 567; Fox v. Rural Home Co., 51 N. E. 1090; Bank v. Ins. Co., 50 Conn. 168; Steiner v. Land & Lumber Co., 26 So. 494; Preston v. Cereal Co., 93 N. W. 136; Davis v. Railroad, 131 Mass. 288; Bank v. Bank (Mo. Sup. Ct.), 72 S. W. 1059; Bacon, Dawson & Co. v. Bank, 79 Mo. App. 406; Trans. Co. v. Car Co., 139 U. S. 24; McCormick v. Bank, 165 U. S. 538; Pearce v. Madison & I. Co., 62 U. S. 443; Railroad v. Bridge Co., 131 U. S. 389; Zabriskie v. Railroad, 64 U. S. (23 How.) 398; Thomas v. Railroad, 101 U. S. 78; Railroad v. Railroad, 118 U. S. 290; Hoagland v. Railroad, 39

Mo. 451; Kansas City v. O'Connor, 82 Mo. App. 665; Shoe & Clothing Co. v. Iron Works Co., 51 Mo. App. 66; Trust Co. v. Miller, 33 N. J. Eq. 162; Reese on Ultra Vires, sec. 72; Brice on Ultra Vires, 66; Rogers v. Belting Co., 56 N. E. 1017; Shoe Foundry Co. v. Iron Co., 72 Fed. 957; Constitution of Missouri, art. 21, sec. 7; Bank v. Hawkins, 174 U. S. 364. (5) The respondent, at the time it accepted the note, had actual knowlege that the appellant indorsed it merely as an accommodation to the railroad company, and had constructive knowledge that the endorsement was void for want of power, for one dealing with a corporation is bound to know what its powers are. McCormick v. Bank, 165 U. S. 538; Thompson's Commentaries on the Law of Corporations (1 Ed.), sec. 8309; Davis v. Railroad, 131 Mass. 258; Lucas v. Trans. Co., 70 Iowa 541; Railroad & Nav. Co. v. Railroad, 130 U. S. 25.

*Peak & Strother* for respondent.

(1) The petition states but one cause of action, although it contains two counts. The first count charges defendant as maker of the note sued on. The second count states all the facts as to the execution of the note, and thus shows how defendant is maker. A general finding for plaintiff would have been good, and the case stands here in the same attitude, as to the questions involved, as if there had been such a finding. Brinkman v. Hunter, 73 Mo. 178; Rinard v. Railroad, 164 Mo. 284. (2) The defendant's name was endorsed on the note sued on before its delivery to plaintiff, and it is therefore a maker of the note. Cahn v. Dutton, 60 Mo. 297; Cox v. Sloan, 158 Mo. 411. (3) The burden is upon defendant to show that it was expressly agreed by and between it and plaintiff, at the time of its endorsement, that it should be an endorser only and not a maker; and no such evidence was offered. Kuntz v. Tempel, 48 Mo. 76; Cahn v. Dutton, 60 Mo. 299; Boyer

v. Boogher, 11 Mo. App. 130; Malting Co. v. Miller,
38 Mo. App. 251.   (4)   The testimony of Mr. Martin
that Mr. Swinney told him that if he "would get the
Trust Company to endorse the note, he would loan the
money," is not sufficient to show that it was agreed that
defendant should incur only the liability of an endorser.
Boyer v. Boogher, 11 Mo. App. 130; Malt. Co. v. Miller,
38 Mo. App. 251; Pohle v. Dickman, 67 Mo. App. 381.
(5)   There was ample evidence to support the court's
finding that defendant was a maker of the note sued on,
and that finding is now conclusive on this court.   (6)
The fact that defendant received no part of the money
for which the note was given, it being discounted by
plaintiff on the faith of defendant's endorsement be-
fore delivery, is of itself no defense.   Miller v. Mellier;
59 Mo. 388; Cox v. Sloan, 158 Mo. 411.   (7)   By the
Act of April 18, 1891, the defendant was invested with
the power to execute the note sued on as it was executed.
Laws 1891, pp. 99-103; State ex inf. v. Trust Co., 144
Mo. 584; The Ashenbroedel Club v. Finlay, 53 Mo. App.
256; Legion of Honor v. Neidelet, 81 Mo. App. 598.
(8)   Even if it were necessary that defendant should
accept the amendments of 1891, the acts of the defend-
ant and its officers and agents in the conduct of its bus-
iness show that it continually exercised the powers
granted in such amendments, as in the transaction in-
volved here, and it can not now say that it did not have
the power it exercised.   Sumrall v. Ins. Co., 40 Mo. 32;
Savings Inst. v. Board of Education, 75 Mo. 408; Muth
v. Trust Co., 88 Mo. App. 596; Miller v. Ins. Co., 92
Tenn. 167; Zabriskie v. Railroad, 23 How. (64 U. S.)
381.   (9)   The execution of the note sued on was within
the powers of defendant.   By the terms of the Act of
1887, defendant had power "to loan money upon real
estate and collateral security . . . and execute and
issue its notes and debentures payable at a future date,
and to pledge its mortgages on real estate and other

securities as security therefor," and also "to buy and
sell . . . all kinds of negotiable and non-negotiable pa-
per." The Belt Railroad was a sub-company of de-
fendant, and was indebted to defendant in a large
amount, and defendant was interested in upholding its
financial standing. The money advanced by plaintiff
was borrowed by these two companies for that purpose,
and was used to pay the employees of the Belt Com-
pany, and thereby kept it a going concern, which de-
fendant then deemed to be for its own financial bene-
fit. Having received this benefit, it can not now repu-
diate the accompanying burden and thereby deprive
plaintiff of the money which it parted with on th
strength of defendant's undertaking. Laws 1887, pp.
116, 117, sec. 4, subd. 8 and 9; Lumber Co. v. Kelter, 201
Ill. 503; Mahoney v. Hardware Co., 27 Mont. 463; In
re West of England Bank, L. R. 14 Ch. Div. 317. (10)
The contract sued on was fully executed by the plaintiff
by the payment of its money to the Belt Railroad Com-
pany. There is nothing in the law of 1887 which ex-
pressly, or by fair implication, prohibits defendant
from making this contract. The Act of 1891 purports
to confer upon it, in express terms, the power to make
it. Plaintiff's president testified that he believed de-
fendant had the power to make it, and defendant's vice-
president testified he had not, at the time, a doubt about
it. Under these circumstances, defendant can not
raise the defense of *ultra vires;* and no one but the
State in a direct proceeding can call the act in question.
Drug Co. v. Robinson, 81 Mo. 26; Welsh v. Brewing
Co., 47 Mo. App. 618; Glass v. Brewing Co., 47 Mo. App.
639; City of Goodland v. Bank, 74 Mo. App. 365; Chen-
oweth v. Express Co., 93 Mo. App. 194; State Board of
Agriculture v. Railroad, 47 Ind. 407; Lumber Co. v.
Rice, 23 Ind. App. 586; 2 Morawetz, Corporations
(2 Ed.), secs. 689-698. (11) Defendant's course of
business for years had been to execute notes similar
to the one sued on. This must have been known to the

stockholders, when they passed the resolution of October 25, 1899, by which "all the acts of the directors, officers, and executive committee of the company had and done since the last annual stockholders' meeting were fully ratified." One of those "acts" was the execution of the first note to plaintiff, of which the note sued on is a renewal. Defendant is, therefore, now bound by this action of its stockholders, and can not plead that the execution of this note was *ultra vires*. Riesterer v. Land & Lumber Co., 160 Mo. 141; State ex rel. v. Cook (Mo.), 77 S. W. 559; Tyrell v. Railroad, 7 Mo. App. 294; Martin v. Mfg. Co., 122 N Y. 165; Holmes v. Willard, 125 N. Y. 80. (12) By the terms of defendant's articles of association, it has power "to loan money upon real estate and collateral security . . . and execute and issue its notes and debentures payable at a future date, and to pledge its mortgages on real estate and other securities and security therefor;" and also "to buy and sell . . . all kinds of negotiable and non-negotiable paper." Under these express powers the following propositions are true: 1 Defendant itself could have lent to the Belt Company the money advanced by plaintiff. 2 Defendant itself could have borrowed of plaintiff the money to be lent by it to the Belt Company and for the money so borrowed could have given to plaintiff "its notes . . . payable at a future date." 3 The loan so made and the notes so given would have been strictly *infra vires* of defendant; and the fact that defendant intended, when it borrowed the money, to lend it again to the Belt Company and that plaintiff knew of such intent, would not have been a defense to the notes so given. The transaction, as had, was in essence a loan to both companies, and a placing of the proceeds of such loan to the credit of the Belt Company by the direction of both companies. Good faith and fair dealing require that it should be upheld as made. Holmes v. Willard, 125 N. Y. 75.

FOX, J.—This suit was commenced in the Jackson County Circuit Court. Its origin may thus be briefly stated:

The Kansas City Suburban Belt Railroad Company is a corporation organized under the railroad laws of Missouri, on the — day of January, 1887, for the purpose of building and operating a belt railroad around Kansas City.

About two years afterwards, namely, in February, 1889, the Guardian Trust Company was organized under the general trust company law of Missouri, as it then existed, as the Missouri, Kansas & Texas Trust Company. Afterwards this name was changed to its present name, Guardian Trust Company.

Mr. E. L. Martin was the president of the Kansas City Suburban Belt Railroad Company from the time of its incorporation continuously until after the time in which the transactions in controversy were had, and soon after the organization of the Guardian Trust Company he became the vice-president of the trust company and continued in such position until after the transactions involved in this controversy were had.

On the 22nd of September, 1899, long after the Kansas City Suburban Belt Railroad was finished and put in operation, Mr. Martin, as president of the railroad company, went to the plaintiff bank and made application to Mr. Swinney, its president, to borrow $25,000 for the railroad company. Mr. Swinney asked him what collateral he wanted to give and Mr. Martin replied that he did not have any at that time. Swinney then told him that he could not make the loan or take the note of the railroad company without collateral or security. It was then suggested by Mr. Martin or Swinney that the Guardian Trust Company should go on the paper as surety, and Swinney for the bank consented to make the loan to the railroad company if the Guardian Trust Company would become surety on or endorse the paper.

In pursuance of this understanding between Martin, representing the railroad company, and Swinney, representing the bank, the following note was made and executed by the railroad company and endorsed by the Guardian Trust Company and delivered to the bank, and $25,000 was deposited by the bank to the credit of the Kansas City Suburban Belt Railroad Company. This deposit was made by the plaintiff in its own bank. The note was as follows:

"$25,000.00            Kansas City, Mo., Sept. 22, 1899.

"Ninety days after date, for value received, we promise to pay to the order of the First National Bank, twenty-five thousand and no-100 dollars at its office in Kansas City, Mo., with interest from maturity at the rate of eight per cent per annum.

"Kansas City Suburban Belt R. R. Co.,
"By E. L. Martin, Prest."

Endorsed: "Guardian Trust Company, by E. L. Martin, Vice-President."

When the note became due it was not paid but was renewed by giving another like note, the only difference being that the endorsement of the trust company in the latter case was signed by F. B. Wilcox, assistant treasurer, instead of E. L. Martin, vice-president, of the trust company. When this second note matured it was not paid but was again renewed by giving another similar note. The last-mentioned note, being the one sued on in this action, differed from either of the two former notes only in that it ran for sixty instead of ninety days, and the name of the Guardian Trust Company was signed by F. B. Wilcox, manager, and is as follows:

"$25,000.00.            Kansas City, Mo., Mch. 26, 1900.

"Sixty days after date, for value received, we promise to pay to the First National Bank or order, twenty-five thousand dollars at First Nat'l Bank, K. C., Mo., with interest after maturity at 7 per cent per annum until paid.

"No. 34348.　　Kansas City Suburban Belt R. R. Co.
"Due May 28, 1900.

"By E. L. Martin, Prest."

Endorsed: "Guardian Trust Company, by F. B. Wilcox, Manager."

The $25,000.00 borrowed by the Belt Railroad Company was deposited to its credit in plaintiff bank, and was all checked out by the railroad company to pay its own obligations. The Guardian Trust Company never in any way received a dollar of the money.

On the 6th day of September, 1900, the said railroad company was placed in the hands of receivers by the United States Court at Kansas City, and Mr. Swinney, president of the plaintiff bank, was appointed as one of the receivers.

Afterwards, to-wit, on the 19th day of September, 1900, the plaintiff instituted this suit on the note last above mentioned. The suit was brought against the defendant, the Guardian Trust Company alone, the Kansas City Suburban Belt Railroad Company not being made a party defendant.

The petition contains two counts. The first alleges that the Guardian Trust Company was the maker of said note and seeks to recover the amount of the note from it as maker. The second count of the petition alleges that the Guardian Trust Company was the endorser of the note and that the same had been protested for non-payment, and seeks to recover from the Guardian Trust Company as endorser.

The answer to the first count admits the incorporation of the plaintiff and defendant, but denies that the defendant made, executed or delivered the note sued on to plaintiff. The answer further alleges that the Kansas City Suburban Belt Railroad Company made the note sued on for so much money then or theretofore borrowed by the Kansas City Suburban Belt Railroad Company from the plaintiff, and that the defendant, the trust company, endorsed the same simply as

an accommodation for the Belt Railroad Company and without any consideration whatever moving to it; that the defendant did not then, or at any other time, receive any part of the consideration for which said note was given, but that the entire consideration thereof, to-wit, the $25,000.00 in money borrowed by the Belt Railroad Company from the plaintiff, was received by the said Belt Company, and that the defendant's connection with the said promissory note was and is nothing more than that of an accommodation endorser, and that all of said facts were well and fully known by the plaintiff and so understood by it at and prior to the execution of the said note by the Belt Company and the endorsement thereof by the defendant. That the defendant was incorporated and organized as a trust company under and by virtue of article 11 of chapter 21 of the laws of the State of Missouri, as found in the Session Laws of said State of the year 1885, at pages 103 and 107, approved March 20, 1885; and as amended by an act of the Legislature of said State, approved March 31, 1887; that the defendant, under the laws of the said State of Missouri and under its charter and articles of association, had no authority or power to endorse said promissory note as accommodation endorser, or otherwise become surety for the Kansas City Suburban Belt Railroad Company thereon; and that the said endorsement of the defendant's name on said note was and is *ultra vires,* without and beyond the powers of the defendant, all of which was well known to the plaintiff at the time of the delivery of the said promissory note.

The answer to the second count of the petition admits that the Kansas City Suburban Belt Railroad Company made the note sued on and that the said note was delivered to plaintiff with the name of the defendant endorsed thereon by F. B. Wilcox, defendant's manager, but denies all of the other allegations in the said second count of the petition.

For further answer to the second count the answer

alleges that the Kansas City Suburban Belt Railroad Company made, executed and delivered the note sued on to the plaintiff for so much money then or theretofore borrowed by the said railroad company from the plaintiff, and that the name of the trust company was endorsed thereon simply as an accommodation for the said Belt Railroad Company and without any consideration whatever; that the defendant did not then or at any other time receive any part of the consideration for which said note was given but that the entire consideration thereof, namely, the $25,000 so borrowed by the said Belt Railroad Company from the plaintiff, was received by the said Belt Railroad Company, and that the defendant's connection with the said promissory note was and is nothing more than that of an accommodation endorser.    That all of these facts were well and fully known to the plaintiff and were so understood by it at and prior to the execution of the said note by the Belt Railroad Company and the endorsement of the defendant's name thereon; and further, that the defendant was incorporated as a trust company under article 11 of chapter 21 of the laws of the State of Missouri, as found in the Session Laws of said State at page 103 and 105 of the year 1885, approved March 20, 1885; and as amended by an act of the Legislature of said State, approved March 31, 1887; that the defendant under the laws of said State of Missouri and under its charter and articles of association, had no authority or power to endorse said promissory note as accommodation endorser, or otherwise become surety for the Kansas City Suburban Belt Railroad Company thereon; that the endorsement of the defendant's name on the said note was and is *ultra vires,* without and beyond the powers of the defendant, all of which was well known to the plaintiff at the time of the delivery of said note.

The plaintiff replied, first denying all the new matter set up in the answer.

Second, that at a meeting of the stockholders of the defendant, held after the execution and delivery of the said note, the acts of its officers in and about the endorsement and delivery of said note, was ratified and approved, by reason of which it is alleged that the defendant can not now repudiate the same.

Third, that the defendant represented to the plaintiff that it had the power and authority under its charter and the laws of the State of Missouri to execute said note, as the surety of the railroad company and to guarantee the payment thereof by said railroad company, and that the defendant had organized and fostered several sub-companies, one of which was the said Belt Company, and that for the space of five years prior to the execution of this note it had been the well-known habit and custom of business of the defendant in dealing with the said plaintiff and the public generally to execute as surety and guarantee the payment of notes of such sub-companies. That said habit and custom of business of the defendant was well known to and relied upon by plaintiff. That under and by virtue of said act of the Legislature of the State of Missouri approved March 31st, 1887, mentioned in defendant's answer, the defendant had power to execute and issue its notes payable at a future date and that by virtue of an act of the Legislature of the said State, approved and in force April 18, 1891, the said act of March 31, 1887, was so amended as to authorize corporations formed under it to guarantee the principal or interest or both of any securities of any kind; that by the laws under which the defendant was organized it had the power to extend its business, by the action of its stockholders, to any one or more of the different classes of business mentioned in said laws, and that after the passage of the act of the Legislature approved April 18, 1891, and particularly for the space of five years prior to the execution of the note in suit, the defendant, in its dealings with its said sub-companies and

the public generally, assumed to have and exercise and did in fact have and exercise the power to secure and guarantee the principal and interest of such notes as these. That the plaintiff relied upon these things and relying upon them assumed and believed that the trust company had authority to execute the note as accomodation endorser or surety for the Belt Railroad Company and was induced thereby to lend the $25,000 to the Belt Railroad Company. By reason of all which, the reply states, the defendant is now estopped to set up *ultra vires* in defence of this suit.

The facts developed at the trial of this case were substantially as follows:

A large part of the business of the defendant was directed towards organizing and promoting certain classes of corporations, referred to by the witnesses in this cause as sub-companies. Among the companies in which the defendant was interested as financial agent was the Kansas City, Pittsburg & Gulf Railroad Company, the Union Terminal Railway Company, the Jansen Place Land Company, and also many others. So far as the Belt Railroad Company was concerned the evidence shows that it was organized before the trust company was formed. Shortly after the organization of the trust company, the defendant corporation in this cause undertook the promotion and financing of the Belt Railroad Company, which means that it bought the bonds and considerable of the stock of the Belt Railroad Company; that was of course back in 1889 and 1890. The evidence also shows that this trust company from time to time advanced money from its own treasury during the process of the construction of the railroad and put it on an operating basis, and that the Belt Railroad Company was largely indebted to the defendant corporation.

As to the execution of the note upon which a recovery is sought in this case, the particular details sur-

rounding the execution of that contract are best told by the parties who negotiated the contract.

Mr. E. F. Swinney, who at the date of the trial of this case was president of the First National Bank, and who was cashier of the bank at the time of the execution of the note, thus details the transaction:

"Mr. Martin came in to me and said that he wanted to get twenty-five thousand dollars for the Suburban Belt Railroad Company. I asked him what collateral he wanted to give. He said he did not have any collateral at that time. I told him I could not take the note without collateral or security. And he asked me if the Guardian Trust Company would do, or perhaps I told him that if he would get the Guardian Trust Company on the paper we would take it. He said he would see about the matter and he left, and if I remember correctly, he called me up and said they would take the money."

On cross-examination he gave the following testimony:

"Q. Mr. Martin was president of the Kansas City Suburban Belt Railroad Company? A. Yes, sir.

"Q. And he applied to you for this loan on behalf of the Kansas City Suburban Belt Railroad Company? A. Yes, sir.

"Q. And the matter of endorsing by the Guardian Trust Company came up after he was in consultation with you, and you either made the suggestion that he get it endorsed by them or upon your demand for security he suggested that it would be so endorsed. A. Just as I said to you, he came and wanted to get this money and I told him I could not let him have the money unless he could give us some collateral. He said he did not have any collateral. I told him then he would have to get—that is my recollection, it was either his proposition or mine—but anyway, that he would get the Guardian Trust Company to sign the note and

we would let him have the money. That is the way it occurred.''

Mr. E. L. Martin's testimony was in part as follows:

"Q. You are a resident of Kansas City? A. Yes, sir.

"Q. How long have you resided here? A. About 32 years.

"Q. Were you connected with the Missouri, Kansas & Texas Trust Company, afterward the Guardian Trust Company? A. Yes, sir.

"Q. When did you become connected with the company? A. Well, I was one of the original directors, I think, when it was organized.

"Q. Were you connected with the Kansas City Suburban Belt Railroad Company? A. Yes sir.

"Q. When did you first become connected with that company? A. When it was first organized. I was its first president.

"Q. When was the company organized? A. I am not quite sure whether it was in 1887 or 1888.

"Q. It was organized prior to the formation of the Missouri, Kansas & Texas Trust Company?· A. Yes sir.

"Q. How long did you remain connected and in what capacity or position with the Kansas City Suburban Belt Railroad Company? A. I remained its president up to April, 1900.

"Q. Then who succeeded you as president of the company? A. Mr. Edson.

"Q. Did you as president have active charge and management of the Kansas City Suburban Belt Railroad Company during all that time? A. Yes, sir.

"Q. Did you have charge of its finances? A. To a certain extent, yes, sir.

"Q. What relation did you sustain to the Missouri, Kansas & Texas Trust Company from the time of its organization until April 1, 1900, when your re-

lations with the Kansas City Suburban Belt Railroad Company terminated and ceased? A. I was vice-president of the trust company.

"Q. Where were the general offices of the trust company during the time of its existence. A. They were here in Kansas City until they were removed to Chicago; Kansas City was the general office, or head office, always the chief corporate office.

"Q. Were the books and records of the company removed to Chicago? A. Yes, sir.

"Q. When was that? A. In October, 1899, I think.

"Q. When were the Chicago offices of the Guardian Trust Company opened; how long prior to the removal of the books to that office? A. They were opened about that time.

"Q. Who was in charge of the office here in Kansas City? Who was the chief officer in charge of the Guardian Trust Company on September 22, 1899? A. Is that the date of the note sued on?

"Q. No; that is the date of the first note? A. I had charge of the office at that time.

"Q. And you were also the president of the Kansas City Suburban Belt Railroad Company at that time? A. Yes, sir.

"Q. Who were the officers of the Guardian Trust Company? A. Mr. Stillwell was president, Mr. J. McD. Trimble, vice-president; Mr. T. L. Chadbourn, vice-president; Mr. W. S. Taylor, treasurer; and Mr. F. B. Wilcox, assistant treasurer.

"Q. Who was the secretary? A. Mr. A. J. Singer.

"Q. Who were the chief officers of the Kansas City Suburban Belt Railroad Company at that time? A. I was president, Mr. Stillwell vice-president, and Mr. Nolthenius, I think, treasurer; and at that time A. L. Howe was assistant treasurer.

"Q. Who were the directors of the two compan-

ies, the trust company and the railroad company, the same or different? A. Well, they were intermixed. Some occupied positions in both companies and some did not.

"Q. During the time the trust company and the officers of the trust company and the officers of the railroad company were thus mingled what was the course of business between the two companies; describe that generally? A. Well, the trust company handled the securities of the Belt line to a very great extent, found a market for them, and it advanced them money at times, when it was needed, and took their notes for it, and matters of that kind.

"Q. In making advances of money how was it done? A. Well, sometimes, it would simply issue a check and charge it up to their account, and at other periods the account would be closed by the execution of notes, sometimes with collateral security. and sometimes without it.

"Q. As I understand it, the securities of the Kansas City Suburban Belt Railroad Company were taken by the M. K. & T. Trust Company, or the Guardian Trust Company, and a market found for them, and marketed by the trust company? A. Yes, sir.

"Q. And from time to time the trust company would make advances of money to the railroad company? A. Yes, sir.

"Q. Now, with reference to the dealings of the two companies with the various banks which has been spoken of here, with the National Bank of Commerce, the Metropolitan National Bank, the First National Bank, and others, I would like for you to give a general description of how the business of the two companies was transacted? A. Well, the trust company as a rule when they advanced the various companies money, just as they did the Belt line company as I have described it, had settlements at various times, and at the settlements notes would be executed by the var-

ious companies, and the trust company, if they needed money, would take the notes to the bank and rediscount them, or put them up behind their notes as collateral security.    That was common.

"Q.  Where the trust company took a note for advances made from time to time by giving a check, how were the notes drawn, to whom were they made payable?  A.  They were, as a rule, made payable to the trust company.

"Q.  And in dealing with the banks those notes would be rediscounted or used as collateral behind the trust company's notes with the bank?  A.  Yes, sir; that was the rule.

"Q.  Was that the course of business pursued with reference to the Kansas City Suburban Belt Railroad Company?  A.  Generally, yes, sir.

"Q.  If there were any exceptions I wish you would specify them, state what they were.  A.  I do not know of any exceptions, save this one case.

"Q.  Now, coming to this transaction, you may describe just what that transaction was.  What you did; if you met any of the officers of the bank, what was said by you and what they said, and what was done in the matter?  A.  I called upon Mr. Swinney and made a request for the loan in the interest of the Kansas City Suburban Belt Railroad Company.

"Q.  You called as president of the railroad company?  A.  Yes, sir.

"Q.  Now proceed.  A.  Mr. Swinney asked me if I had any collateral.  I told him I did not have any to put up and we talked the matter over, and he said if I would get the trust company to endorse the note he would loan the money, and I told him I would see what I could do.  I went to the 'phone and telephoned Chicago, to Mr. Stillwill, and he said it was all right for the trust company to endorse the note, and I did so and made the discount.

"Q. Did you return to the bank after you had telephoned to Mr. Stillwill? A. Yes, sir.

"Q. Did you execute the note after that? A. Yes, sir.

"Q. And entered the endorsement of the Guardian Trust Company on the back of the note? A. I am not right sure whether I executed the note before I left the trust company's office, or after I got to the bank, but it was executed before it was delivered to the bank, of course.

"Q. You heard Mr. Wilcox's testimony about him telephoning to Chicago? A. Yes, sir.

"Q. Do you know anything about any such occurrence as that? A. No, sir.

"Q. Did you tell him about this transaction? A. Yes, sir, I told him at the time.

"Q. Was there any occasion for him to telephone when you had telephoned? A. Not on that occasion. He may have telephoned on a later occasion. I don't know. The conversation I speak of now, was when the original note was made.

"Q. Now, when you negotiated that loan with the First National Bank, what was done with the proceeds? A. The Kansas City Suburban Belt Railroad Company kept an account with the bank and the proceeds were credited to its account.

"Q. What were they used for? A. To meet the pay roll of the company at that time.

"Q. Was that the occasion of your going to the bank to borrow the money, on account of the pay roll? A. Yes, sir.

"Q. A pressing indebtedness? A. Yes, sir.

"Q. Was there any part of the proceeds of that loan paid to or received in any way, directly or indirectly, by the Guardian Trust Company, or the Missouri, Kansas & Texas Trust Company? A. No, sir.

"Q. Was any part of it received or paid or any indebtedness of the Kansas City Suburban Belt Rail-

road Company to the Guardian Trust Company, or the Missouri, Kansas & Texas Trust Company? A. No, sir; I think not.

"Q. Was there any consideration of any kind whatever for the Guardian Trust Company endorsing that note? A. Well, it was purely an accomodation endorser.

"Q. Now, do you remember the occasion of the first renewal of that note on the 23rd of December, 1899, the note introduced in evidence signed by the same Kansas City Suburban Belt Railroad Company, by you as president, and endorsed by the Guardian Trust Company by Wilcox—do you remember that; if so tell the circumstances? A. I don't remember what occurred at the time of this renewal, except that is my signature; I signed it.

"Q. You don't know where it was done? A. No; I don't remember whether I signed it at the office or in the bank.

"Q. How about the note in suit, which is also stamped with the name of the railroad company, signed by you, and endorsed with the stamp of the Guardian Trust Company, by Wilcox as manager? A. Well, I don't remember about that either; that is where I signed it. I saw the note, of course, and I signed it all right. But I don't remember the circumstances.

"Q. What was the relation of the trust company to the various companies called here by counsel subcompanies? How was the trust company interested in their behalf? A. Well, the trust company had been instrumental in placing the stocks and bonds of these various companies to outside people in some instances, and it had stock itself in some of the companies. And as is generally done in such cases it was looking after the interests of the various companies and it was interested in them in that way and assisted them in that way."

On cross-examination he gave the following testimony:

"Q. In September, 1899, when this loan was made, were you the chief officer of the Guardian Trust Company in this city? A. The first note, yes, sir.

"Q. You had general charge of the business here, at that time? A. Yes, sir.

"Q. You were in control of all of the other officers and employees here? A. Yes, sir.

"Q. Were you also at that time vice-president of the company? A. Yes, sir.

"Q. And you were also president of the Kansas City Suburban Belt Railroad Company? A. Yes, sir.

"Q. At that time the Kansas City Suburban Belt Railroad Company was largely indebted to the trust company? A. Yes, sir.

"Q. Why was it that you got this money? A. It was for the use of the Suburban Belt to pay pressing debts.

"Q. How did that interest the trust company? A. Well, the trust company was interested in the Suburban Belt by having a large claim against it, and possibly it held a little of its stock, but if any, very little at that time.

"Q. Now, isn't it a fact that the trust company indorsed this note for the benefit of the Belt line in order to keep the Belt line on its feet, so that it might in the end pay its indebtedness to the trust company? A. Certainly it was made in the interest of the Belt line company, and there may have been motives of that kind, but the application of the loan by the Belt line was for the immediate use of the Belt line. Of course we felt it our duty to help the Belt line in any way we could.

"Q. You didn't tell Mr. Swinney at that time that the trust company had no power to make this indorsement? A. No, sir, I did not. I thought the indorsement was all right or I would not have made it.

"Q. You did not have any question in your mind

about the power of the trust company to make that indorsement?   A.   No, sir.

"Q.   Wasn't it a common thing for the trust company to give its note for the use of some of the sub-companies?   A.   If some of the subcompanies needed money and the trust company did not have money, it would borrow the money and let the other company have it.

"Q.   It was the custom to make the note direct to the lender and turn the money over to the borrower? A.   Sometimes, and sometimes they re-discounted; most any way to get the money when they were hard up.

"Q.   You asked Mr. Swinney to put the proceeds of this note of September 22, 1899, to the credit of the Belt line?   A.   Yes, sir."

It is further disclosed by the record that at the annual meeting of the defendant's stockholders held at Kansas City, October 25, 1899, after the making of the first note, as stated, the following action was taken and recorded in defendant's records:

"On motion, all of the acts of the directors, officers and executive committee of the company had and taken since the last annual stockholders' meeting were fully ratified."

There was a great deal more testimony indicating the close business relations between the defendant, Guardian Trust Company, and the Belt-Railroad Company; however, it is unnecessary to reproduce in detail the testimony on that subject.   We have made sufficient reference to the main facts to enable us to determine the legal propositions involved in this controversy.

At the close of the testimony the trial court refused a peremptory instruction in the nature of a demurrer to the evidence, requested by defendant, and gave an instruction on the part of the plaintiff, substantially declaring the law to be that the finding and judgment must be for the plaintiff, and judgment was rendered

by the court in accordance with this declaration. From that judgment defendant in due time and form prosecuted its appeal to this court and the cause is now before us for consideration.

### OPINION.

The first proposition presented to our consideration on the record in this cause is embraced in the contention of the appellant that, even if the defendant was liable upon the contract sued on, its liability was that of an accommodation indorser and it was erroneously held liable as maker under the first count in the petition.

The facts in this case clearly show that defendant's name was indorsed on the back of this note before its delivery to the plaintiff, and there is an absence of any testimony indicating any understanding or stipulation that it should be held simply as an indorser. The defendant, being neither a payee nor indorsee in said note, must be treated prima facie as a comaker. It was ruled in Kuntz v. Tempel, 48 Mo. l. c. 76, that if a defendant places his name on the back of a note and if the act was done to give the note credit with the payee, and before it was accepted by him in satisfaction of the debt due from the maker, he was a surety and not an indorser, unless he expressly stipulated that he should be held as indorser. This rule was approved and followed in the case of Boyer v. Boogher, 11 Mo. App. l. c. 131. It was said in that case that, "It has long been the settled law of this State, that one who writes his name on the back of a note of which he is neither payee nor indorsee, becomes prima facie liable as a comaker, and will be held to be such in the absence of extrinsic evidence that it was the contract or understanding of the parties, at the time he so indorsed it, that he should be liable only as indorser." To the same effect is Schmidt Malting Co. v. Miller, 38 Mo. App.

1. c. 254.   In that case the court very clearly announced the rule applicable to this proposition.   It thus stated the law: ''The note offered in evidence made the defendant prima facie liable as maker.   [Powell v. Thomas, 7 Mo. 440; Lewis v. Harvey, 18 Mo. 74; Kuntz v. Tempel, 48 Mo. 71; Boyer v. Boogher, 11 Mo. App. 130.]   To avoid such liability, it was incumbent upon him to show that there was a contract or understanding between him and the payee, that he should be bound only as technical indorser, or indorser in the technical legal sense, as the use of the word indorser by the parties to the contract does not of itself constitute such proof.   [Boyer v. Boogher, supra.]''

It is apparent from the testimony in this cause, as disclosed by the record, that at the time of the execution of this note, or at the time of the indorsement of the name of the defendant upon the back of it, or at the time of its delivery, there was no understanding or agreement between the plaintiff and defendant that the defendant should be held simply as an indorser, and we are unwilling to say that the fact that one of the counts in the petition was against the defendant upon this note as an indorser, or the fact that the note was duly protested prior to the institution of the suit, would supply the necessary proof of a stipulation or understanding that it was to be held as an indorser, as is required under the rule announced in the cases herein cited, in order to make the liability of defendant in this suit that of an accommodation indorser.   If there had been any testimony tending to show an understanding that the defendant was to be treated in this transaction as an indorser, the fact of suing him upon one of the counts as an indorser and protesting the note prior to the institution of the suit, might furnish corroborating evidence of the testimony tending to prove that fact; but standing alone it can not be held as furnishing proof that there was any such agreement or understanding.   In the absence of any such proof the

trial court properly held that the defendant was a co-maker of this note.

This brings us to the consideration of the only remaining and most important proposition involved in this controversy, that is, did defendant have power to execute this note under the circumstances surrounding its execution? In other words, under the testimony as disclosed by the record before us, was the act of the defendant in the execution of this note a valid one, or was it *ultra vires* and void? While this correctly states the main proposition involved, it embraces also the further proposition: conceding that, in the execution of this note, for the purposes indicated by the testimony, it exceeded its powers conferred upon it by the statute— upon the undisputed facts surrounding the execution of this note, is defendant in a position to avail itself of the defense of *ultra vires?*

The powers conferred upon the defendant as applicable to the disputed questions in this case, may be thus stated: Section 1427, Revised Statutes 1899, provides that: "Corporations may be created under this article for any one or more of the following purposes: Fourth, to act as agent or attorney in fact for any person or corporation in the management and control of real or personal property and the sale or conveyance of the same, and for the investment of money, and to act for and represent corporations or persons under power and letters of attorney, and as agents for persons and corporations for the purpose of issuing, registering, transferring or countersigning the certificates of stock, bonds, or other evidences of debt of any corporation, association, municipality, state or public authority, on such terms as may be agreed upon. Fifth, to accept from and execute trusts for married women in respect to their separate property, whether real or personal, and act as agent for them in the management of such property, and generally to have and exercise

such powers as are usually had an exercised by trust companies. Sixth, to act as executor under last will or as administrator of the estate of any deceased person, or as guardian or curator of any infant, insane person, idiot or habitual drunkard, or trustee for any convict in the penitentiary, under the appointment of any court of record having jurisdiction of the person or estate of such deceased person, infant, insane person, idiot, habitual drunkard or convict. Seventh, to guarantee the fidelity and diligent performance of their duty of persons or corporations holding places of public or private trust; to guarantee or become surety on any bond given by any person or corporation, and to re-insure or guarantee any person or corporation against loss or damage by reason of any risk assumed by insuring the fidelity or diligent performance of duty of any such person or corporation, or by guaranteeing or becoming surety on any bond; to guarantee the principal or interest, or both, of any securities of any kind, and to certify and guarantee titles to real estate. Eighth, to loan money upon real estate and collateral security, and execute and issue its notes and debentures payable at a future date, and to pledge its mortgages on real estate and other securities as security therefor, which notes and debentures may be issued to an amount not exceeding, in the aggregate, ten times the amount paid up on the capital stock of the company issuing the same, and shall in no case exceed the amount of first mortgages pledged to secure their payment. Ninth, to buy and sell all kinds of government, State, municipal and other bonds and all kinds of negotiable and non-negotiable paper, stocks and other investment securities."

Counsel for appellant as well as respondent very fully and ably presented the controverted legal propositions involved in this case, not only in their oral arguments, but by exhaustive briefs, fully covering all the questions presented by this record.

At the very inception of the investigation of the

important questions presented by counsel, we are confronted with at least an apparent conflict in the authorities, but a careful analysis of the cases treating of the subject under discussion demonstrates that the conflict is more apparent than real. The difficulty which has confronted the courts in the treatment of this question as to the exercise of powers by private business corporations conferred upon them, has not been in the application of the well-settled general rule that corporations can only exercise such powers as are authorized by their charter, but it has been in the announcement of the exceptions to such general rule made necessary by reason of the particular conditions and circumstances surrounding the transaction in which the power is sought to be exercised.

Morawetz, in his work on Private Corporations (2 Ed.), vol. 1, sec. 362, fully recognized this difficulty. He says: "No rule can be framed which would be of any practical value in determining cases of this character. The most that can be done is to state the general principles which have influenced the courts in their decisions, and to illustrate these general principles by examples. The application of the law to individual cases must always remain a matter involving the exercise of sound practical judgment and business experience. Great caution is therefore necessary in treating a decision that a corporation has or has not authority to do a particular act, as a precedent to be followed in other cases. Such a decision would not establish an absolute rule, which could be applied mechanically; but all the facts and the general principles by which the court was guided in reaching its conclusion must always be considered. It is important also to bear in mind, that the fact that a transaction of a corporation has been sustained by a court does not necessarily prove that the corporation had a right to enter into it. There are many instances in which the court will disregard the illegality of a transgression

by a corporation of its chartered powers, in order to do justice between the parties.''

The reasonable limits of this opinion must be our apology for failing to review all of the authorities cited by counsel in the discussion of the legal questions presented. We must be content with a reference to those which support and are in accord with the conclusions of this court as to the correct rule applicable to the case before us. The contention, so ably presented by counsel for appellant, is that the act of the Guardian Trust Company in the execution of the note in suit was unauthorized by the statute under which the trust company was organized, and is therefore void. This leads us to a consideration of the conditions and circumstances surrounding the execution of this note. That the Guardian Trust Company and the Kansas City Belt Railway Company, for whom this money was procured from the bank, the plaintiff, were not strangers, is made apparent from the undisputed facts of this case. The undisputed testimony shows that the Guardian Trust Company was deeply interested in the ultimate success of the purposes of the Kansas City Belt Railway Company. Upon the organization of the Guardian Trust Company, for many years it undertook to successfully promote and finance the Belt Railroad Company; it bought the bonds and considerable of the stock of the railroad company; from time to time it advanced money from its own treasury to put it upon an operating basis; in fact, the testimony indicates that the principal business of the defendant after its organization was the organization and promotion of numerous corporations. The president of the railroad company at the time of the execution of this note was also the vice-president of the trust company, and the testimony of this official, as disclosed by the record, clearly indicates the deep interest the defendant had in the success of the railroad company in the accomplishment of the purposes for which it was organized. That the

business relations between the defendant and the Belt Railroad Company were close and that the defendant was a large creditor of said railroad company and therefore was interested in maintaining it as a going concern, can not be disputed in view of the evidence disclosed by the record; in fact, the witnesses in referring to the railroad company and other corporations that had been financed by the defendant, referred to them as subcompanies.

The plaintiff, First National Bank, was fully aware of the business relations between the defendant and the railroad company and of its course of dealing with it, in the way of furnishing the finances for its operation; hence it was natural for the bank to conclude in the execution of this note, that it was simply in pursuance of a business policy that had been adopted by the trust company in taking care of the financial condition of the Belt Railroad Company. It was earnestly argued that the plaintiff knew that no part of the money secured upon this note went to the Guardian Trust Company; that may be true, but it is equally true that the bank had a right to presume in the execution of this note that the Guardian Trust Company was still pursuing its policy for a long time previously adopted, in financing the railroad company. While no part of the consideration embraced in this note was applied to the benefit of the Guardian Trust Company, it does not necessarily follow that it was executed as purely a matter of accommodation. It had the right under the powers conferred by the statute to act as agent in the management and control of the property of the railroad company, and to take such steps in the way of financing the company as it deemed proper and appropriate, and the consideration for the act performed by the defendant in the interest of the railroad company was a matter to be settled between them; and in view of the relations existing between these two companies and the policy adopted by the defendant in financing the railroad com-

pany, the plaintiff could well rest upon the presumption that the making of this note was in pursuance of the former policy of the defendant and for such consideration as they may have seen proper to agree upon.

The contract in this case was fully executed on the part of the plaintiff and its money was parted with by reason of the execution of the note by the defendant. This being true, the question confronts us, should the defense of *ultra vires* as interposed by the defendant be availing under the facts as disclosed by the record? We have reached the conclusion that it should not be. It may be conceded that under the powers conferred upon the defendant by the statutes under which it was organized, it would not be authorized to simply engage in the business of becoming a purely accommodation maker or indorser of promissory notes. Upon the facts in this case this legal principle is not applicable to the questions herein presented. "When acts of corporations are spoken of as *ultra vires,* it is not intended that they are unlawful or even such as the corporation cannot perform, but merely those which are not within the powers conferred upon the corporation by the act of its creation, and are in violation of the trust reposed in the managing board by the shareholders, that the affairs shall be managed and the funds applied solely for carrying out the objects for which the corporation was created." [Whitney Arms Co. v. Barlow, 63 N. Y. 62.]

While the testimony offered does not show that the defendant at the time of this transaction was a stockholder in the Belt Railroad Company, yet it is disclosed by the record that at one time it was a large stockholder, and that it is now a large creditor of that company. The record is silent as to the disposition of the stock owned in the railroad company by the defendant; hence it may be said that this fact of the defendant owning stock having been shown to have once existed, nothing to the contrary appearing, the pre-

sumption would be indulged that it still exists.  Aside from this, the testimony of the officers rather indicates that, at the time of the execution of this note, it was a stockholder.

It is apparent that the execution of this note by the defendant was not purely a matter of accommodation, but was induced by reason of the interest in the railroad company, not only as a stockholder, but also as a creditor, and that the procuring of the money upon this note to pay the pressing indebtedness on the part of the railroad company was not only of interest to the defendant as a stockholder, but at least increased the chances of finally realizing from their debts against said company.  It was under these circumstances that this note was executed, and the contract on the part of the plaintiff was fully performed upon the faith of such acts by the defendant.

The conclusions reached as indicated herein find support in a number of well-considered cases in other jurisdictions, and is in keeping with that just rule, as announced by the New York courts, that the plea of *ultra vires* should not as a general rule prevail, whether interposed for or against a corporation, when it would not advance justice, but on the contrary would accomplish a legal wrong.  Similar views are entertained by the Supreme Court of the United States.  In Railroad v. McCarthy, 96 U. S. l. c. 267, it is said that "the doctrine of *ultra vires,* when invoked for or against a corporation, should not be allowed to prevail where it would defeat the ends of justice or work a legal wrong."

The defendant had been for a number of years financing the Belt Railroad Company.  By the execution of this note it had received the benefit from the plaintiff in the performance of an undertaking it had long been engaged in, of furnishing the Belt Railroad Company with finances, and having received the full consideration from the plaintiff in aid of the perform-

ance of a duty it had undertaken to perform in the interest of the Belt Railroad Company, it is in no position now, the contract having been fully executed on the part of the plaintiff, to say that its act was not within the powers conferred upon it by the statute. The correct rule was thus properly announced in the case of Whitney Arms Co. v. Barlow, supra: "One who has received from a corporation the full consideration of his engagement to pay money, either in services or property, cannot avail himself of the objection that the contract thus fully performed by the corporation was *ultra vires,* or not within its chartered privileges and powers. It would be contrary to the first principles of equity to allow such a defense to prevail in an action by the corporation. It is now very well settled that a corporation cannot avail itself of the defense of *ultra vires* when the contract has been, in good faith, fully performed by the other party, and the corporation has had the full benefit of the performance and of the contract. If an action cannot be brought directly upon the agreement, either equity will grant relief or an action in some other form will prevail. The same rule holds *e converso.* If the other party has had the benefit of a contract fully performed by the corporation, he will not be heard to object that the contract and performance were not within the legitimate powers of the corporation. . . . Did the question now made arise upon an application by the stockholders and corporators to restrain the corporate agents from applying the corporate funds to purposes foreign to the corporation, or engaging in business outside of that for which the company was formed, or on proceedings by the sovereign power to annul the charter for an abuse of the powers granted, or in a proceeding to enforce and for the performance of an executory contract, where, upon a rescission or annulling the agreement, both parties would have the same position as if no contract had been made, the rules of decision would be

different from those which must prevail in the present action. In either of the cases suggested it is very likely the courts would be compelled to give full effect to the objection and hold the business unauthorized and a violation of the charter, and a forfeiture of the chartered rights and the contract null, and refuse to perform it or give effect to it.''

In State Board of Agriculture v. Railroad, 47 Ind. l. c. 411, it is said: ''A distinction may, perhaps, be well made between the case where an act of a corporation is done in violation of an express prohibition in its charter, or in some other law relating thereto, and the case where there is simply a defect of power in the corporation to do the act. So it appears that there are acts of corporations which strictly are *ultra vires,* and for the doing of which the State may proceed against the corporation, and yet the acts of the corporation, under the particular circumstances, be binding upon the corporation. There appears also to be a distinction between the rights of the parties to a contract which remains wholly executory, and the rights of parties to a contract when it has been wholly executed by the party dealing with the corporation.'' The doctrine announced by the Indiana court is quoted approvingly by the Supreme Court of the United States in Hitchcock v. Galveston, 96 U. S. 341.

In Angell & Ames on Corp. (9 Ed.), 240, note a, it is said: ''The courts of New York have gone very far in enforcing contracts made by corporations, although they are not justified by their charters; and the law in that State now appears to be that such a contract, which is purely executory on both sides, and where no wrong will be done if the parties are left in their previous situation, should not be enforced, but that the executed dealings of corporations must be allowed to stand for and against both parties, when the plainest rules of good faith so require.'' [Parish v.

Wheeler, 22 N. Y. 494; Bissel v. Railroad, 22 N. Y. 258; DeGroff v. Amer. Linen Thread Co., 21 N. Y. 124.]

The proper conception of the just and equitable rule applicable to this subject, entertained by the courts of this country, is very clearly manifested in Steam Navigation Co. v. Weed, 17 Barb. 378. That "was an action to recover money loaned, and the defense was, that the corporation had no power to loan the money, and it was held that the defendant was not at liberty to avail himself of the defense. The court drew a distinction between the violation of an express statute and the mere want of power to make the contract. . . . The learned judge, after examining a number of authorities, concludes his opinion as follows: 'I am happy to come to the conclusion that the law will not sustain this most unconscionable defense. It ill becomes the defendants to borrow from the plaintiff one thousand dollars for a single day, to relieve their immediate necessities, and then to turn around and say, "I will not return you this money, because you had no power, by your charter, to lend it." Let them first restore the money, and then it will be time enough for them to discuss with the sovereign power of the State of Connecticut the extent of the plaintiff's chartered privileges. We shall lose our respect for the law, when it so far loses its character for justice as to sanction the defense here attempted.' "

An examination of all the authorities upon this subject indicates clearly a distinction in the exercise of powers by public corporations and private business corporations, and it will be observed that the further distinction is made between contracts strictly *ultra vires* the corporation and those where only in excess of the corporate grant of power. This distinction was clearly made in the case of Chenoweth v. Pacific Express Co., 93 Mo. App. 185. It was said by the court in that case: "Whatever may be the proper rule in

those cases where an *ultra vires* contract is entered into by a public corporation, exercising governmental functions, we do not think in cases like the present where the contract entered into, though in excess of the chartered powers of the corporation, has been fully performed by the party seeking its enforcement, that the corporation can refuse to proceed, and when sued for a breach of the contract, shelter itself behind the defense of *ultra vires.*" To the same effect is Smith v. Richardson, 77 Mo. App. 422. The law as applicable to this case was thus stated: "No corporation can bind itself or its stockholders by a contract expressly prohibited by its charter or the general law. Such contracts are strictly *ultra vires,* and create no obligation so far as they are executory, although the consideration therefor may have been received and enjoyed by the corporation. On the other hand, an act or contract merely in excess of the power granted to corporations, but which is not expressly forbidden either by its charter or the general law of the State, although lacking affirmative authority for its performance on account of the silence, on that subject, of its charter or the general law, may yet, if the contract has been executed by the other party and its consideration received by the corporation, bind the latter on the principle of estoppel so that it cannot be annulled by the corporation without a return of the consideration received."

The Supreme Court of Illinois, in Bradley v. Ballard, 55 Ill. 413, applied the doctrine of equitable estoppel to a corporation, and in discussing the proposition, which is similar to the one involved in this case, very tersely and forcibly gave utterance to its views; it said: "Neither is it correct to say that the application to corporations of the doctrine of equitable estoppel, where justice requires it to be applied, as when, under a claim of corporate power, they have received benefits for which they refuse to pay, from a sudden discovery that they had not the powers they had

claimed, can be made the means of enabling them indefinitely to extend their powers. If that were true, it would be an insuperable objection to the application of the doctrine, even for the purpose of preventing injustice in individual cases. But it is not true. This doctrine is applied only for the purpose of compelling corporations to be honest, in the simplest and commonest sense of honesty, and after whatever mischief may belong to the performance of an act, *ultra vires,* has been accomplished. But while a contract remains executory, it is perfectly true that the powers of corporations cannot be extended beyond their proper limits, for the purpose of enforcing a contract. Not only so, but on the application of a stockholder, or of any other person authorized to make the application, a court of chancery would interfere and forbid the execution of a contract *ultra vires.* So, too, if a contract, *ultra vires,* is made between a corporation and another person, and, while it is yet wholly unexecuted, the corporation recedes, the other contracting party would probably have no claim for damages." The court in that case, as this court in the case at bar, fully recognizes that there are many cases in apparent conflict with the principles announced, and in the course of the opinions the court in recognition of that conflict said: "We are aware that cases may be cited in apparent conflict with the principles here announced, but the tendency of recent decisions is in harmony with them. While courts are inclined to maintain with vigor the limitations of corporate action, whenever it is a question of restraining the corporation in advance from passing beyond the boundaries of their charters, they are equally inclined, on the other hand, to enforce against them contracts, though *ultra vires,* of which they have received the benefit. This is demanded by the plainest principles of justice."

The record in this case discloses further that at a meeting of the stockholders of the defendant corpora-

tion all of the acts of the directors, officers and executive committee of the company had and taken since the last annual stockholders' meeting, were fully ratified. Upon the subject of acquiescence and ratification of acts performed by a corporation, the Supreme Court of New York, in Kent v. Quicksilver Mining Co., 78 N. Y. 159, clearly states the rule as approved by that court. It was said by the court in that case, that "in the application of the doctrine of *ultra vires*, it is to be borne in mind that it has two phases: one where the public is concerned; one where the question is between the corporate body and the stockholders in it, or between it and its stockholders, and third parties dealing with it and through it with them. When the public is concerned to restrain a corporation within the limit of the power given to it by its charter, an assent by the stockholders to the use of unauthorized power by the corporate body will be of no avail. When it is a question of the right of a stockholder to restrain the corporate body within its express or incidental powers, the stockholder may in many cases be denied, on the ground of his express-assent or his intelligent though tacit consent to the corporate action. If there be a departure from statutory direction, which is to be considered merely a breach of trust to be restrained by a stockholder, it is pertinent to consider what has been his conduct in regard thereto. A corporation may do acts which affect the public to its harm, inasmuch as they are *per se* illegal or are *malum prohibitum*. Then no assent of stockholders can validate them. It may do acts not thus illegal, though there is want of power to do them, which affect only the interest of the stockholders. They may be made good by the assent of the stockholders, so that strangers to the stockholders dealing in good faith with the corporation will be protected in a reliance upon those acts. The general rules of law relating to contracts and private rights apply to corporations as well as to individuals, and the principles

of law of agency apply to both alike. The stockholders are the equitable owners of the corporate property, and if the officers or trustees do any unauthorized act or incur indebtedness which would create a corporate liability, the stockholders may subsequently ratify the acts and validate the original unauthorized transaction." [Martin v. Niagara Falls Paper Co., 122 N. Y. 165.]

The conclusions reached in this case, however, do not rest upon the doctrine of ratification, and it is unnecessary to express an opinion as to our approval of this sweeping rule announced in the case cited by the New York court upon that subject; the weight of authority and the better reasons seem to be, that where the corporation has absolutely no authority to perform the act, the ratification by the stockholders would not make it valid. The ratification by the stockholders in the case at bar becomes significant, as indicating their acquiescence in the business policy pursued by the defendant toward the Belt Railroad Company.

We repeat in this case that the defendant had adopted a business policy in respect to the Belt Railroad Company, that of undertaking to finance the company to the end that it might be successfully operated. The plaintiff in this case in furnishing the money upon the execution of this note by the Belt Railroad Company and the defendant, was rendering a benefit and aid to the defendant in carrying out a business policy it had so long pursued, and it would be grossly inequitable to permit the defendant after fully receiving the assistance of the plaintiff in carrying out this undertaking to finance the Belt Railroad Company, and relieve it of a pressing indebtedness, to now say that it had exceeded its corporate powers and interpose such want of power as a defense to this action. As was said in the case of Wright v. Pipe Line Co., 101 Pa. St. l. c. 207, "The law never sustains a defense of this nature out of regard for a defendant; it does so only where an

imperative rule of public policy requires it. The instances are rare in which a corporation or individual has been permitted to set up its own wrong in order to retain both the property and its price. . . . It would be difficult to imagine a defense with less merit, and the law would be exceedingly impotent were it to allow it to succeed.'' So it may be said as to this case, that it would be a humiliating confession as to the inefficiency of our system of jurisprudence in the administration of justice to hold that the defendant could receive the aid, assistance and benefit from the plaintiff in carrying out an undertaking in which it had long been engaged, financing the Belt Railroad Company, and then being called upon to answer by a contract for such aid and assistance, it simply says, we were unauthorized to make the contract.

At this advanced age in our civilization and the rapidity with which our commercial interests are advancing, methods and occasions for concentrating the efforts of our people in the prosecution of business by forming corporations, multiplying from day to day, the time is at hand for the enforcement of the rule as announced by Lord ST. LEONARDS in Railroad v. Hawkes, 5 H. L. Cases, l. c. 370, where it was said that ''the safety of men in their daily contracts require that this doctrine of *ultra vires* should be confined within narrow bounds.''

There are no public interests involved in this case. The stockholders are the equitable owners of the corporate property. The plaintiff, as well as the president and vice president of the defendant corporation, in executing this contract placed full faith in the power of the corporation to execute it. The stockholders selected their officers, ratified their acts after the execution of the note; the interests of no third parties have intervened; the State is no party to this proceeding and there are no principles of public policy or of the administration of justice which demand that the defense

of *ultra vires,* as interposed in this case by the corporation itself, should be availing. It was said in St. Louis Drug Co. v. Robinson, 81 Mo. l. c. 26, that "conceding the facts to be as defendants allege, it is sufficient on this point to say that, in a line of decisions of this court, unbroken except in the case of Matthews v. Skinker, 62 Mo. 329, it has been held that the question of *ultra vires* can only be raised in a direct proceeding, by the State against the corporation, and not in a collateral proceeding by another, except when the charter of the corporation not only specifies, and, therefore, limits it to the business in which it may engage, but by express terms, or by a fair implication from its term, invalidates transactions outside of its legitimate corporate business."

Without expressing any opinion as to the correctness of the rule announced in the case last cited, or its application to the facts of this case, it at least indicates very clearly the tendency of this court to follow the line of decisions as herein cited, which supports the conclusion that the defense of *ultra vires* is never sustained out of regard for a defendant, but only where an imperative rule of public policy requires it.

It is unnecessary to pursue this subject further, or to indulge in a review of the numerous authorities cited by counsel, or to give expression to our views as to the powers which can be lawfully exercised by the defendant conferred under the statute granting such powers. For it may be conceded that the defendant is not authorized to indorse or execute promissory notes, purely as an accommodation maker or indorser, yet under the facts of this case, as disclosed by the record, the concession can be of no avail to the defendant.

We must be content with simply saying that the defendant corporation, in the execution of this note and procuring the money from plaintiff, for the railroad company, was simply carrying out a business policy in respect to financing said company, which it inaugurated

shortly after the organization of the railroad company; that by the execution of this note, the defendant was given the aid and assistance of plaintiff in maintaining such policy and the presumption which could be reasonably indulged by the plaintiff that the defendant received such consideration as was agreed upon between the defendant and the Belt Line Company for its efforts in providing the necessary finances for the conducting of the business of the railroad company. The officers of the respective corporations, in good faith, consummated this transaction, and if the defendant can avoid the payment of the note in suit, upon the plea that its act was a wrongful one, in excess of its powers and void, then we confess, that the maxim, which is as old as the law itself, that "no person can take advantage of his own wrong," is absolutely shorn of all its force and vitality under our system of jurisprudence. The judgment of the trial court was right and should be affirmed, and it is so ordered. *Brace, C. J., Gantt, Burgess* and *Lamm, JJ.,* concur; *Marshall* and *Valliant, JJ.,* not sitting.