## TRYSON et al. v. SOUTHERN REALTY CORPORATION.

(Court of Appeals of District of Columbia. Submitted March 9, 1921. Decided June 6, 1921.)

### No. 3472.

1. **Corporations ⬤⟿439—Sale by insolvent corporation of building owned by it held not ultra vires.**

   A sale by a solvent insurance company, with the approval of its stockholders, of a building which was its principal asset, but which was burdensome to it because of its nonliquid character, to a realty corporation, for whose stock the insurance company's stockholders were invited to exchange their stock, at a price and on terms causing no substantial loss to the stockholders who exchanged, or those who did not exchange, their stock *held* not ultra vires, illegal, or void, under Code of Law, §§ 607, 608, relative to the powers of corporations and the management of their affairs by trustees.

2. **Corporations ⬤⟿388(4)—Stockholders, participating in sale of building by exchanging stock for stock in purchasing corporation, not entitled to attack sale.**

   Where, on a sale of property by an insurance company to a realty company, stockholders were invited to exchange their stock for stock in the realty company, stockholders who participated in the exchange could not attack the sale as ultra vires, illegal, and void.

3. **Corporations ⬤⟿370(1)—Doctrine of ultra vires to be applied within narrow bounds as respects private corporations.**

   The doctrine of ultra vires should be confined within narrow bounds, as applied to private corporations.

Appeal from the Supreme Court of the District of Columbia.

Suit by William Frank Tryson and others, receivers, against the Southern Realty Corporation. From a decree in favor of defendant, plaintiffs appeal. Affirmed.

Charles A. Douglas, Howard A. Boyd, Michal J. Keane, and Jo. V. Morgan, all of Washington, D. C., for appellants.

John Lewis Smith, L. A. Dent, and H. P. Gatley, all of Washington, D. C., for appellee.

HITZ, Acting Associate Justice. This is an appeal from a decree of the Supreme Court of the District of Columbia, passed July 20, 1920, denying the prayer of a bill to set aside the sale of the building hereinafter referred to, and a subsequent decree of August 12, 1920, which dissolved an injunction incorporated in the first-mentioned decree against any conveyance or incumbrance of said building by the appellee, or the declaring of any dividend on its stock until the liabilities of the First National Insurance Company (of which appellants are receivers), both absolute and contingent, had been fully satisfied, secured, or discharged. The latter decree permitted the giving of a bond by the appellee in the sum of $300,000, indemnifying the receivers against any claims of creditors of the Insurance Company on account of any indebtedness which might be properly adjudicated as subsisting and bona fide debts of said company, to the extent that they might be in excess of the assets of said company.

⬤⟿For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Prior to December 15, 1914, the Insurance Company was the owner of an undivided moiety in the property known as the Southern Building, in the city of Washington, and on that date became by proper conveyance the sole owner. At that time the building was subject to three deeds of trust, securing $800,000, $450,000, and $325,000, respectively. To carry out the terms of the purchase of the moiety acquired December 15, 1914, and to finance the transaction, a corporation, the appellee, was created February 10, 1915, under the laws of Delaware, the corporators being seven members of the executive committee of the Insurance Company and one citizen of Delaware, all expenses of the organization of the new corporation being paid by the Insurance Company.

By deed of February 24, 1915, the Insurance Company conveyed the Southern Building to the appellee, and thereupon the second and third trusts above mentioned were released, and, on March 18, 1916, the appellee reconveyed the property to the Insurance Company subject to the original first trust of $800,000 and to a new second trust of $600,000. The by-laws of the Insurance Company provide, in part, as follows:

"The management of the affairs of the company shall be vested in the board of trustees, consisting of fifteen stockholders, to be elected by ballot at the annual meeting of stockholders to be held on the Thursday following the second Wednesday in June of each year."

The incumbrances nearing maturity, the trustees of the Insurance Company called a special meeting of its stockholders to be held February 7, 1917, for the purpose of considering a plan to refinance the building, at which meeting such a plan was proposed by the trustees and adopted by the stockholders. Pursuant thereto this property was on February 14, 1917, again deeded to the appellee, and by it, on the 28th of the same month, again reconveyed to the Insurance Company, subject only to the lien of a first trust of $900,000.

At the stockholders' meeting of February 7, 1917, a committee had been appointed to investigate the condition of the Insurance Company and to devise plans for the betterment thereof, the report of said committee to be made first to the trustees and by them submitted to a special meeting of the stockholders. Such report was made to the trustees March 7, 1917, in substance suggesting that such of the stockholders of the Insurance Company as might so desire should enter into a corporation, to be called the Southern Realty Corporation, which would take over the building at a price affording such stockholders an allowance of their proportionate part of the then existing surplus of the Insurance Company, those so entering to exchange their Insurance Company stock for stock in the Realty Corporation, par for par, or one share of insurance stock for one share in the Realty Corporation. This report was approved by the trustees, and a circular letter, under date of March 10, 1917, inclosing a copy of the plan, was sent to the stockholders of the Insurance Company.

On May 18, 1917, the trustees received an offer from the appellee to purchase the building for $1,800,000, payment to be made by the assumption of the first trust of $900,000; by approximately 39,000

shares of the stock of the Insurance Company, with its proportionate part of the surplus of that company as of April 30, 1917; and by second trust bonds payable five years after date with interest at 4 per cent. for the balance of the purchase price of the equity of $900,000. This offer was accepted by the trustees at this meeting, conveyance of the property was directed, and the deed therefor was subsequently executed and delivered, and there is no contention made that this price was inadequate or below the value of the property.

The capital stock outstanding of the Insurance Company was represented by 182,101 shares, of the face value of $5, making a total of $910,505. There were 39,707 sent in, pursuant to the plan for exchange, amounting to $198,535. The settlement made between the trustees of the Insurance Company and the Realty Corporation with respect to this sale, was as follows:

| | | |
|---|---:|---:|
| Purchase price | | $1,800,000.00 |
| Less first mortgage | | 900,000.00 |
| | | |
| Balance to be accounted for | | $ 900,000.00 |
| First National capital April 30, 1917 | $910,505.00 | |
| Exchanged for Realty Company stock, 39,707 shares, or | 198,535.00 | |
| Ratio | .21804 | |
| First National surplus April 30, 1917 | 126.219.76 | |
| Less net rent due April 30, 1917 | 15,070.40 | |
| | | |
| Surplus to be apportioned | $111,149.36 | |
| Southern Realty Company's proportion | | $24,235.00 |
| Add amount of stock exchanged | | 198,535.00 |
| Second Mortgage Bonds to be given the First National by the Realty Company | | 677,230.00 |
| | | |
| Total | | $ 900,000.00 |

In accordance with the by-laws, notices to the stockholders of the annual meeting to be held on June 14, 1917, were sent out, and these were accompanied by a call for a special meeting, to be held immediately after the annual meeting, for the purpose of voting upon a resolution for the reduction of the capital stock of the Insurance Company to $711,000. At the annual meeting 528½ shares were voted in person, and 147,512 shares by proxies, some of which were given in 1914, others in 1915, and some early in 1916.

These proxies were of two classes. One form, designated as the "stock association proxy," ran for three years from 1916, and empowered the persons named to vote the stock "at any and every annual or special meeting of the stockholders * * * on any and all matters and questions which may be considered and presented at any such annual or special meetings occurring within said period." The other form, called "old proxy," unlimited as to time, give the power to vote the stock "at any annual or special meeting of the stockholders" in voting for trustees of the company, "and in the transaction of any other business as may properly come before the meeting"; these proxies reciting that they are to remain in full force until revoked in writing. It is not claimed that there was any revocation of either form of proxy.

At the annual meeting a resolution was passed ratifying all the acts

of the board of trustees and the officers of the company during the past year. The special meeting was held immediately after the annual meeting; the memorandum of settlement of the sale, above set forth, was presented, and the transaction ratified. A resolution diminishing the capital stock to the sum of $711,000 was passed; the vote being taken by ballot through tellers, and the 148,040½ shares, represented as above stated, being cast in favor of the adoption of the resolution.

In August, 1917, a majority of the trustees of the Insurance Company filed a petition in the Supreme Court of the District of Columbia, Equity No. 35358, stating that at a meeting of the trustees held on August 8, 1917, a resolution was passed reciting that, because of unwarranted attacks and malicious rumors made and circulated about the company, the trustees believe it impracticable to succeed in the fire insurance business, and deem it beneficial to the interests of the stockholders that the company be dissolved, although entirely solvent, and directing the trustees to apply for the voluntary liquidation and dissolution of the company; the petition praying such dissolution under section 769 of the Code, together with the appointment of receivers and reference to the auditor as provided by law.

Temporary receivers were named, and later the appellants herein were appointed permanent receivers. On March 3, 1919, the appellants filed a report in the cause in which they were appointed receivers, stating that a majority of them recommended that they be authorized to take such action as might be necessary to set aside the sale to the appellee, and on the same day an order was passed authorizing such a proceeding, and the present bill was filed April 3, 1919.

In the court below there was practically no conflict regarding the facts, the question being as to the validity of the sale upon the case as briefly stated above. There are seven assignments of error, which, taken together, present the contention that the sale and conveyance of the building to the appellee was ultra vires, illegal, and void.

[1] The Insurance Company was incorporated under the general law of this District. Section 607 of the Code provides that the persons who have acknowledged and filed the certificate required by the preceding section shall be a body corporate, with certain enumerated powers, and—

"by their corporate name be capable in law of purchasing, holding, and conveying any real or personal estate whatever which may be necessary to enable the company to carry on its operations named in such certificates, but shall not mortgage such estate or give any lien thereon, except in pursuance of a vote of the stockholders of the company."

Section 608 of the Code provides that "the stock, property, and concerns of such company shall be managed by not less than three nor more than fifteen trustees," whose qualifications are specified.

While not bearing directly upon the validity of the sale, it is proper to ascertain what injury, if any, was inflicted thereby, first on the creditors; and, secondly, on the stockholders of the Insurance Company who did not enter into the exchange. From creditors there is no complaint; and it does not in any way appear that they can or will suffer loss, for it is conceded that the Insurance Company is solvent. No

stockholder, as far as the record shows, personally unites with the receivers in their attack upon the sale.

In the testimony of one of the attorneys for the appellants there is a statement to the effect that at a hearing before the auditor in the course of the dissolution proceeding a holder of 10 shares was represented by counsel, and that a number of attorneys raised objections, but details as to the extent of the interests of their clients are not given, nor does it appear that any further action was taken by them, so that the stockholders are not before the court, except through the appellants, under section 774 of the Code, which is as follows:

"Upon his giving surety as aforesaid the receiver shall be vested with all the estate, real or personal, of the corporation, for the benefit of its creditors and stockholders."

But, assuming that the stockholders of the Insurance Company are now before the court through the bill of the receivers, for the present purpose such stockholders consist of two groups, namely, those who participated in the exchange and those who did not. Those who participated receive for their shares of stock in the Insurance Company a bookkeeping credit for their portion of the surplus of that company and stock in the Realty Corporation, share for share, at 100 cents on the dollar; while those who did not participate in the exchange receive their portion of the surplus of the Insurance Company in cash, and second mortgage bonds of the Realty Corporation at 100 cents on the dollar, which represents an obligation of that company prior to its capital stock, and which must be paid or satisfied before that stock has any value.

[2] Those stockholders who participated in the exchange, of course, cannot be heard now to attack it; while those who did not participate will receive the full face value of their stock, together with their portion of the surplus of their company. But it is said by the appellants that these second mortgage bonds of the Realty Corporation carry interest at only 4 per cent., while its stock paid an annual dividend of 5 per cent. in 1918.

Laying aside the fact that the record shows no dividend since that time and gives no light on the subsequent financial condition of the company, we view the difference in value between a 5 per cent. stock and a 4 per cent. prior bond as de minimis in the present controversy. While the financial result of the transaction complained of is not conclusive of its legality, it is of much significance in considering the question here presented, which involves no allegation of fraud or inadequacy of price, but rests upon the alleged ultra vires character of the transaction.

While the Southern Building was not the only asset of the Insurance Company, it was its main asset, and it was clearly nonliquid in character and not essential to the conduct of its business. One of the difficulties confronting the Insurance Company prior to the sale was an objection from the insurance authorities of the District of Columbia to the nonliquid character of its equity in the Southern Building.

[3] In this situation the managers of the company sought, obtained, and accepted an offer to buy the building at a fair price. The In-

surance Company was a private corporation, and the doctrine of ultra vires, as applied to such corporations, should be confined within narrow bounds.

In the case of Bell v. Kirkland, 102 Minn. 213, 113 N. W. 271, 13 L. R. A. (N. S.) 793, 120 Am. St. Rep. 621, the court quotes with approval a statement by Mr. Freeman to the effect that the doctrine of ultra vires, as applied to contracts of private corporations, has almost lost its meaning, and in First National Bank v. Guardian Trust Co., 187 Mo. 494, 86 South. 109, 70 L. R. A. 79, the opinion embodies a statement by Lord St. Leonards, that "the safety of men in their daily contracts requires that this doctrine of ultra vires should be confined within narrow bounds." This case presents a situation where the trustees of a corporation of this class, under the Code provision and its own by-laws, had the power of "management of the affairs of the company," and receiving an offer of purchase for a building, the continued ownership of which they believed was a burden upon the company, made sale of it for a fair price. Their action was reported to and ratified by the stockholders at an annual, and at a special meeting immediately following, where 148,000 shares out of a total of 182,000 were cast in favor of the ratification.

Very little help could be gained by a review and discussion of the numerous cases cited by counsel for the respective parties. Many of the decisions could, perhaps, be reconciled or distinguished, but none cover the exact situation here, so that this case must be determined upon its own facts. Under all the circumstances we cannot say that the transaction here challenged was ultra vires or illegal, or that any good purpose would be accomplished by setting aside the sale, producing a condition of confusion, and opening the way for further expensive litigation.

The result is that the decrees appealed from must be affirmed, with costs; and it is so ordered.

Mr. Justice HITZ, of the Supreme Court of the District of Columbia, sat in the place of Mr. Justice ROBB in the hearing and determination of this appeal.

⊜For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes