TEACHERS ANNUITY AND AID ASSOCIATION of the District of Columbia, a corporation, Appellant,

v.

RIGGS NATIONAL BANK OF WASHINGTON, D. C., Trustee, Appellee.

No. 15202.

United States Court of Appeals District of Columbia Circuit.

Argued Nov. 17, 1959.

Decided May 5, 1960.

Mr. Harvey H. Holland, Jr., Washington, D. C., with whom Messrs. James C. Wilkes and Allen Jones, Jr., Washington, D. C., were on the brief, for appellant.

Mr. Frederick M. Bradley, Washington, D. C., with whom Mr. Charles C. Abeles, Washington, D. C., was on the brief, for appellee.

Before WILBUR K. MILLER, BAZELON and DANAHER, Circuit Judges.

WILBUR K. MILLER, Circuit Judge.

The principal question presented by this appeal is whether an irrevocable trust was established when Teachers Annuity and Aid Association executed to Washington Loan and Trust Company a declaration of trust providing that the sum of $121,500 then deposited with that institution should be held in perpetuity by it as trustee, the income therefrom to be used in the payment of annuities to its members (the membership having been closed) and, after the death of the last annuitant, to be used for the benefit and relief of non-member "white teachers of the Public Schools of the District of Columbia."

The Association insists the instrument it executed merely created an arrangement which it had the right to modify, and therefore its corporate action in 1957 purporting to increase the annuities of members and to authorize the invasion of the corpus for that purpose was proper and should be given effect. The trustee [1] contends the declaration of June 26, 1928, created an irrevocable trust in favor of the Association members and the designated ultimate charitable beneficiaries; it doubts the validity of the Association's 1957 action which it says would impair and perhaps finally destroy the interest of the ultimate beneficiaries.

Teachers Annuity and Aid Association was incorporated November 7, 1894, to form and accrue "a fund for the allowance of annuities to retired and to permanently disabled teachers who are members of the Association * * *." It established what it called a Permanent Fund, the income from which was to be used to supplement dues received from members in the formation of an annuity fund for the payment of benefits and expenses. After a government-sponsored retirement program for teachers was established in 1920, there was little need for an organization such as the Teachers Annuity Association and thereafter it attracted fewer new members each year.

In recognition of this fact, the Association on January 21, 1928, adopted a revised "constitution" which provided that no new members should be admitted after January 1, 1928, and that, after the Association's full obligation to all its members had been discharged, its income "shall be used for relief or benefit of the white teachers of the Public Schools of the District of Columbia for such purposes and in such manner as its board of trustees shall direct." It was also provided that the funds of the Association should be divided into a Trust Fund and an Annuity Fund. The Trust Fund was to consist of $121,500 to be paid to and held in perpetuity by the Washington Loan and Trust Company and its successors, as trustee, with full power and management and control. No provision was made for disbursement from the corpus of the Trust Fund. The income therefrom, together with dues of members, was to constitute the Annuity Fund, to be used "to pay annuities, death benefits, and all other expenses."

The constitution fixed the amount of the annuities payable to members in Article IX:

"Section 1. No annuity shall exceed the sum of six hundred dollars ($600). Whenever the annuity fund shall be insufficient to pay in full all annuitants and other beneficiaries, the whole of the said fund, less the current expenses, shall be divided equally among the annuitants and other beneficiaries; and every payment made to an annuitant or other beneficiary under the provisions of this section shall be considered as having been made in full of all claims to the date of said payment.

---

1. The Riggs National Bank is now the trustee, having by consolidation succeeded Washington Loan and Trust Company.

"Section 2. Annuities shall be paid in ten (10) installments as early as practicable in each month except August and September.

"Section 3. No annuity shall be paid for less than a full month."

Pursuant to the newly adopted constitution, the Association executed June 28, 1928, to Washington Loan and Trust Company a declaration of trust which provided that the sum of $121,500 which had accumulated in what was originally called the Permanent Fund, and was then being deposited with the trustee, should be held perpetually by it, "in and upon the trusts" therein described. Again, no provision was made for invasion of the corpus of the Trust Fund. The income therefrom was to form a part of the Annuity Fund for the payment of annuities to members, death benefits and expenses. It was further provided that "when all annuitants are deceased the entire income" from the Trust Fund "shall be used for relief or benefit of the white teachers of the Public Schools of the District of Columbia" subject to the limitation "that no person shall receive more than six hundred dollars ($600) in any one year." [2]

In January, 1931, the Association adopted a revised constitution which in some respects changed the constitution of January 21, 1928, but did not attempt to increase the annuities of members nor to authorize invasion of the corpus of the Trust Fund. A "Ratification and Confirmation" executed by the Association to the trustee in 1933 merely approved, ratified and confirmed payments to annuitants and beneficiaries theretofore made by the trustee, about which some question had arisen. These instruments do not affect the questions presented here.

On June 24, 1957, the Association addressed a letter to The Riggs National Bank, trustee, advising that certain amendments to the revised constitution had been adopted which increased the members' annuity and death benefit payments to $50.00 per month. Nothing was said in the letter to indicate invasion of the corpus of the Trust Fund would be necessary or was intended.

On May 9, 1958, the trustee filed a complaint in the United States District Court for the District of Columbia against Teachers Annuity, setting forth the history of the Association, the formation of the trust and the attempt of the donor to alter its provisions by increasing the annuities to be paid its members. The trustee recited that as of October 31, 1957, it held assets valued at approximately $135,241.39, producing income of $5,200 per annum; that there were then 51 members of the Association receiving annuities averaging $83.33; that if the sum of $600 were paid to each of the annuitants the initial cost would approximate $30,660 per annum, "which would result * * * in substantial diminution and possible complete consumption of corpus before the death of the last annuitant."

Because of this situation, the trustee prayed to be instructed as to its duty with respect to the following question:

"Plaintiff believes that by the revised constitution of January 21, 1928, as amended in 1931, and particularly the declaration of trust of June 26, 1928, Defendant Donor may have created an irrevocable trust of the trust fund, the principal thereof to be kept intact in perpetuity and that, if this be so, the action taken by the donor association and its members in June, 1957, is invalid in that it violates the terms of the trust by invading the 'trust fund.' Defendant Donor contends that in 1928 it created with its funds a trust which was subject to modification by it, that the defendant association could not validly create an irrevocable trust with its funds for the benefit of non-members of the association, and that its action in June 1957

---

**2.** This designation of ultimate beneficiaries is found in the constitution, a copy of which was attached to and made a part of the trust instrument.

456

in amending its constitution, to which the trust is tied, so as to increase the annuity payments to its members, was in all respects valid and proper."

Teachers Annuity answered, saying *inter alia,* its 1957 corporate action did not amend the previous provision for the use of income for the benefit of the "white teachers of the public schools of the District of Columbia"; that it had the right to modify the trust agreement, as it attempted to do by the 1957 revision, by authorizing expenditures from the corpus of the Trust Fund; and that the provision in favor of "white teachers," to whatever extent it might be construed as irrevocably committing the Trust Fund to the ultimate purpose of aiding non-members, would be invalid and unenforceable as being beyond the original object and purpose of the corporation as stated in its charter. Nevertheless, Teachers Annuity contends that, even after its 1957 amendment, the "white teachers" would still be the ultimate beneficiaries. This seems somewhat inconsistent with the *ultra vires* theory later advanced by the Association and which, if accepted, would render the trust agreement void *ab initio* as far as the white teachers are concerned and would remove them as ultimate beneficiaries.

The District Court granted summary judgment to the trustee and instructed it "to maintain intact the corpus of said trust fund and permit no invasion thereof by Defendant, its Board of Trustees, or its membership * * *." This appeal followed.

We shall first discuss the *ultra vires* question, for if the Association's contention in that regard is correct, there is no further question; the trust was invalid so far as the "white teachers" were concerned and the 1957 revision was valid and should be given effect. The appellant's articles of incorporation described its object as follows:

"The business and objects of the said association are the formation and accrual of a fund for the allow-ance of annuities to retired and to permanently disabled teachers *who are members of the association,* by means of a stipulated and periodical payment of membership dues, and by contributions from whatever source." (Emphasis supplied.)

Appellant's original constitution, adopted at the time of its organization, stated the object of the corporation in greater detail:

"The object of this association shall be to provide and furnish pecuniary aid, from time to time, to such of its members as shall be incapacitated for teaching in the public schools of the District of Columbia, by reason of sickness or advanced age, in such manner and upon such terms and conditions as the said association by its constitution and by-laws shall prescribe; *and also to receive, hold and expend,* in such manner as the donors may designate, *donations of money for the aid of other teachers not hereinbefore provided for."* (Emphasis supplied.)

This indicated the purpose of the corporation was not only to benefit its members but also ultimately to benefit teachers who were non-members.

 The declaration of trust for the members and non-member ultimate beneficiaries was executed pursuant to authority granted by the annual meeting of the membership in 1928, which included all those who are now members; and it was ratified by the members in 1931. The establishment of the trust was for a purpose which was neither criminal, nor against public policy, nor in fraud of creditors. Having been authorized by the members and subsequently ratified by them, the execution of the trust instrument in favor of non-members as ultimate beneficiaries may not now be attacked by the corporation itself as an *ultra vires* act. Cf. Whitney v. Wyman, 1880, 101 U.S. 392, 25 L.Ed. 1050; Tryson v. Southern Realty Corp., 1921, 51 App.D.C. 55, 274 F. 135. Particularly is this true here, where the members who

now compose the appellant corporation were among its members when the act now under attack was initiated and later ratified.

■ We think, moreover, that laches prevents the Association from asserting now, more than 30 years after the establishment of the trust, that establishing it was an *ultra vires* act. In January, 1928, when the Association was deciding what to do with $121,500 which had accumulated in the Permanent Fund, its closed membership consisted of 236 teachers. Some wanted to distribute the accumulation among the members, but a majority preferred the trust arrangement which was adopted. Those favoring distribution might then have attacked the trust as *ultra vires,* but none did so. In 1959, the plea of *ultra vires* was made for the first time, and by the Association itself. To sustain it would be to enrich the 45 members who then remained at the expense of 190 who had died since 1928 and the one who had resigned.[3]

We conclude the defense of *ultra vires,* if ever available, is not now well taken, and so we pass to a discussion of the principal question: whether the trust is irrevocable, so that the Association may not alter its terms in a manner which would impair or extinguish the interest of the non-member ultimate beneficiaries.

It is generally held, and in some jurisdictions is provided by statute, that neither a private nor a charitable trust may be modified or revoked unless the power to do so is reserved at the time the trust is created, regardless of whether the trust instrument contains language indicating irrevocability. 3 Scott, Trusts § 311 (1956); 4 Scott, Trusts § 367 (1956). In other words, there is a legal presumption that a trust is irrevocable, unless there is express provision to the contrary.

■ This general rule has been followed in the District of Columbia with respect to private trusts. Hurt v. Gilmer, 1930, 59 App.D.C. 282, 40 F.2d 794; Liberty National Bank v. Hicks, 1948, 84 U.S.App.D.C. 198, 173 F.2d 631, 9 A.L.R. 2d 1355, rehearing denied (1949). As to charitable trusts, the question does not seem to have been reached in this jurisdiction. We now hold that a charitable trust, like a private trust, may not be revoked or modified by the settlor, unless the power of revocation or modification is reserved when the trust is set up.

■ Even when the presumption is the only basis for irrevocability, it will prevail unless there is language in the trust instrument which can be said to reserve the power of revocation. And where the presumption of irrevocability is strengthened by express words of perpetuity or other indicia that the trust was intended to be perpetual, it will be held to be irrevocable, unless there is also a clear and definite statement to the contrary. In the event there are such plainly inconsistent provisions, the court must resolve the difficulty by determining from the four corners of the trust instrument what the actual intention of the settlor was.

■ But positive language of perpetuity cannot be negated by inferences of revocability drawn from language indicating the reservation of power to modify in some minor fashion which is short of revocation. The provision for reservation must be unqualified and unmistakable if it is to clash with an affirmative provision for irrevocability so as to form an issue as to the settlor's intention which must be resolved by the court.

■ With these principles in mind, we examine the trust agreement. We find, as heretofore noted, that it contains affirmative language indicating the trust was to be irrevocable. It expressly provides the Trust Fund shall be held perpetually by the trustee for the benefit of the members and ultimately the "white teachers." It directs the disbursement of the income from the Trust Fund, but

3. If the 236 members had divided the fund of $121,500 in 1928, each would have received about $514.80. Now the 45 survivors seek an annual distribution of $600 each.

does not authorize invasion of the corpus. On the other hand, we find there is no express reservation of the power to revoke the perpetuity provision, either in the trust agreement or in the attached 1928 constitution.

It is said the power exists, however, because the trust agreement recites that the constitution attached to it may be later amended or displaced by another.[4] Thus the claim of a reserved power to revoke the trust is based on inference rather than on specific language.

It should be remembered that the 1928 constitution authorized the establishment of two funds, and that the trust agreement, in establishing them, defined their nature, and prescribed the trustee's duty with respect to both. The trustee was to hold the Trust Fund in perpetuity and to place the income therefrom in the Annuity Fund, in exactly the manner the 1928 constitution had provided that the income from the perpetual Trust Fund should become a part of the expendable Annuity Fund.

The immediate question is, then, whether the warning that the constitution might be amended, contained in the recital from the trust agreement quoted above, was a reservation of the right to nullify the positive provisions for perpetuity. To construe the recital as a reservation of the unrestricted power to change the constitution so as to make the trust revocable would be by indirection to infer from the recital an intention, at the inception of the trust agreement, to nullify its express language of perpetuity. Such an intention is not to be discerned through inference, but only through a clear and affirmative expression.

We observe, moreover, that the trust agreement's only specification as to revision of the constitution is the following:

"In Further Trust, should trustee be required under any future revi-

sion of the said revised Constitution of donor to perform any other services than herein expressly mentioned or referred to *in the management of the 'trust fund' and the receipt and disbursement of income therefrom and in the receipt and disbursement of funds of the 'annuity fund'* trustee shall be guided by any such future revision of said revised Constitution aforesaid, and further should trustee be required to perform any services now rendered by any of the officers of donor, such services shall be likewise rendered and performed pursuant to any such future revision of said revised Constitution of donor; * * *." (Emphasis supplied.)

The recital in the trust agreement that the attached constitution might be changed is given consistent meaning if in application it is restricted to the purposes expressed in the italicized portion of the paragraph from the trust agreement quoted just above. That excerpt seems to us to confirm the inviolability of the Trust Fund by referring only to "the receipt and disbursement of income therefrom," as distinguished from its reference to "disbursement of *funds* of the 'annuity fund' * * *."

The only indication we find in the trust agreement from which it might be argued that distribution of the Trust Fund was contemplated is in the paragraph which fixes the trustee's compensation: "trustee shall be entitled * * * to a further fee of three (3) percent of the corpus of the 'trust fund' if and when such corpus shall be distributed by trustee in any manner whatsoever." This simply gives the trustee additional compensation if termination of the trust by operation of law should require distribution of the corpus. We regard the language just quoted as quite insufficient to

4. We quote from the trust agreement:
"Whereas, a copy of the revised Constitution aforesaid of donor which is hereby referred to and made a part hereof and for identification signed by the Recording Secretary of donor on its behalf, is hereto attached and shall be treated as the Constitution now in force, and trustee shall be entitled to consider that such Constitution shall remain in force until notified officially by donor; * * *."

support the theory that Teachers Annuity had reserved the right to terminate the trust and require distribution of the Trust Fund, in the face of the affirmative provision that it should be held perpetually.

Indications in the trust instrument that the power of revocation was reserved are therefore inferential only, as we have said. Its express terms with respect to modification of the constitution at most indicate a reservation of power to modify in a manner short of invasion of the corpus.

On the whole, we conclude that Teachers Annuity established an irrevocable trust by the terms of which the Trust Fund must be held in perpetuity by the trustee, and that the power to invade the corpus was not reserved and therefore does not exist. The District Court having so ruled, its judgment will be upheld.

Affirmed.